457 So.2d 616 (1984)
STATE of Louisiana
v.
John E. BROGDON.
No. 82-KA-0925.
Supreme Court of Louisiana.
September 10, 1984.
*620 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry J. Morel, Jr., Dist. Atty., Gregory Champagne, Abbott Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Victor E. Bradley, Jr., Norco, Manina Dubroca, St. Rose, Robert P. Fuhrer, Morgan City, for defendant-appellant.
DENNIS, Justice.
This is our second capital sentence review in this case. Defendant, John E. Brogdon, was convicted of first degree murder and sentenced to death in accord with the jury's recommendation. On appeal, this court affirmed defendant's conviction but reversed the sentence and ordered a new penalty hearing. State v. Brogdon, 426 So.2d 158 (La.1983). On remand, after a change of venue and a penalty *621 hearing before a different judge, a different jury recommended capital punishment, and the court sentenced defendant to death. In this appeal of the capital sentence only, defendant raises 27 assignments of error, arranged in 24 arguments. We consider all arguments and assignments, although some are discussed in abbreviated form, and affirm the sentence.
The following factual summation by this court in its previous review of defendant's case contains the background facts:
At approximately 7:00 p.m. on October 7, 1981, Barbara Jo Brown (Bobby) [the eleven year old victim] and her older sister Rubeta walked to a Time Saver convenience store a few blocks from their Luling, Louisiana home to use a pay telephone. While on the telephone, Rubeta saw the nineteen-year old defendant and seventeen-year old Bruce Perritt arrive at the store. Perritt approached Bobby and put his arm around her. Rubeta called her away and the two left the store. On the way home, Rubeta gave Bobby permission to visit a neighbor and told her that she would return for her in a few minutes.
Rubeta returned for Bobby about ten minutes later and learned that she had returned to the Time Saver. Unable to find Bobby at the convenience store or at the homes of any of their neighbors, Rubeta notified her mother, who was at work, and called the police. A young friend of Bobby's stated that she had seen her earlier that evening in a car, sitting between the defendant and Perritt. Shortly after 9:00 p.m., two young men were driving behind a levee near Luling and came upon Bobby's body. Perritt's vehicle was parked a short distance away. Shortly thereafter, two other men saw the defendant and Perritt walking on a road near the levee. The defendant was without a shirt and appeared disheveled. Based on this set of circumstances, the defendant and Perritt were arrested for the murder of Barbara Jo Brown.
The defendant voluntarily confessed to the murder. In the statement, he described a crime of unparalleled savagery and brutality. The defendant recounted how he and Perritt had picked up Bobby at the Time Saver and driven her to the levee. The two repeatedly raped her and forced her to perform oral sex on them, all the while pummeling her with their fists. They then broke bottles on the cement and stabbed her repeatedly with the jagged edges. Perritt found a brick and hurled it at Bobby, striking her in the head. The defendant then used the brick to beat her until he `thought she was dead.' Throughout the ordeal Bobby had pleaded for her life and fought back against her two assailants as best she could. The extensive bruises and lacerations on her forearms were described by the pathologist as defensive in nature. The defendant stated that he had killed Bobby because she knew her assailants, and he was afraid that she would "tell on them" for raping her.
At trial, the pathologist testified that Bobby had been brutalized so extensively that her skull, internal organs, and vertebrae were exposed. Bobby's vagina had been pierced with a sharp object all the way into her abdominal cavity. Two blood-covered, pointed sticks were found at the scene of the crime, both of which the defendant and Perritt had used to brutalize and torture their victim beyond that which they could accomplish with their hands and other crude weapons.
The defendant attempted to plead guilty to the crime, but the trial judge refused to accept the plea and entered for him pleas of not guilty and not guilty by reason of insanity. A sanity commission was appointed by the trial court, and, after a separate sanity hearing, the defendant was found capable of standing trial. At trial, the defendant's only witness was a psychologist who testified that the defendant had suffered a psychotic episode at the time of the offense and did not, at that time, know the difference between right and wrong. She testified that the defendant had a borderline I.Q. and personality disorder which *622 would account for his violent and aggressive nature. In rebuttal, the two sanity commissioners testified for the state that the defendant had understood the natural consequences of his acts at the time of the offense. (Footnotes Omitted.)
426 So.2d at 162-163.
At the commencement of the second penalty hearing before a different jury the judge informed the jurors that the defendant previously had been tried and found guilty of first degree murder; that it was their function, after hearing the same evidence presented at trial and any additional evidence, to recommend as a sentence either death or life imprisonment without parole. During the hearing the parties presented through live witnesses substantially the same evidence introduced at the guilt phase trial.
At the conclusion of the second penalty hearing the jury recommended that the defendant be sentenced to death and found two aggravating circumstances: (a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape; and (b) the offense was committed in an especially heinous, atrocious, or cruel manner. The district court sentenced the defendant in accordance with the jury's recommendation, and the defendant appealed.
Assignments of Error Numbers 1 and 16
The district court excluded the defendant's proffer of testimony by a Catholic priest and a Jewish rabbi to the effect that capital punishment in any case conflicts with particular religious or moral principles. Defendant argues that this constituted reversible error because the jury may consider any relevant mitigating circumstance in a capital sentence hearing. La.C. Cr.P. art. 905.3; 905.5(h); See also Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604-05, 98 S.Ct. at 2964-65 (footnote omitted) (emphasis in original).
The evidence proffered in mitigation was not relevant to any issue which may properly be resolved in a capital sentence hearing. By enacting the death penalty statute the legislature decided that capital punishment is socially and morally appropriate punishment for some first degree murderers. In establishing the capital sentence hearing the legislature sought to direct and limit the jury's discretion so that there would be a meaningful basis for distinguishing the cases in which it is imposed from the many cases in which it is not. See Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932; 49 L.Ed.2d 859 (1976). Evidence that the death penalty per se is immoral does not tend to show how a particular defendant compares with or is to be distinguished from other capital offenders. This type of evidence would be relevant to a legislative or constitutional attack upon the death penalty in general, but it does not assist the jury in its function of deciding how a particular defendant should be ranked among other capital offenders. Cf. State v. Watson, 449 So.2d 1321 (La.1984).
This assignment is without reversible merit.
Assignments of Error Numbers 2, 3 and 13
Defendant argues that the district court erred by permitting the state to introduce evidence of his confession, consent to search and waiver of rights forms in the sentencing hearing. This evidence had been introduced during the previous guilt phase trial, after the court overruled defendant's motion to suppress. The defendant filed another motion to suppress this evidence prior to the second sentencing hearing. The court permitted the defendant to introduce in support of the motion additional evidence not considered in his initial effort to suppress his confession, consent to search and waiver of rights. After considering the new evidence and a *623 transcript of the testimony presented at a hearing on the first motion to suppress, the district court denied defendant's motion.
The Code of Criminal Procedure provides that the jury in a capital sentence hearing may consider any evidence offered at the trial on the issue of guilt. La.C. Cr.P. art. 905.2. If the introduction of such evidence at the sentencing hearing would be fundamentally unfair or inject into the proceedings a substantial risk that the death penalty will be inflicted in an arbitrary or capricious manner, the court's constitutional obligation to exclude such evidence would override the statute. See Gregg v. Georgia, supra, 428 U.S. at 188, 96 S.Ct. at 2932. In the absence of such an unfair, arbitrary or capricious element, however, the statute requires admission and consideration of the evidence.
The defendant bases his objection to the evidence on two grounds. First, he complains that the district judge did not actually see and hear the witnesses at the first motion to suppress hearing. The judge did not preside at the first motion to suppress hearing. She merely read the transcript of the witnesses' testimony at that hearing. Second, the defendant argues that the evidence does not support a finding that his confession, consent to search and waiver of rights were voluntary.
Defendant's arguments do not present reversible merit. The first trial judge determined that the motion to suppress should be overruled. The second trial judge determined that the newly presented evidence should not change that conclusion. Our review of the record convinces us that the second trial judge's procedure and decision were reasonable and that the defendant's right to a fair proceeding was not prejudiced. Moreover, we conclude therefrom that her determination that defendant's confession was voluntary was not arbitrary or clearly erroneous. Finally, the introduction of this evidence relating primarily to defendant's guilt in his penalty hearing did not inject an element of fundamental unfairness or a substantial risk of arbitrariness or capricousness into the sentence proceedings.
Assignment of Error Number 4
Defendant argues that the district court erred in rejecting his challenge of a juror for cause. The juror was a St. Mary Parish deputy assessor. He testified that his friendship, and his wife's acquaintance, with law enforcement officers within St. Mary Parish would not prevent him from rendering an impartial verdict. Since the officers directly involved in the investigation of the offense and presentation of the state's case were St. Charles Parish officers, the judge's finding that the juror's relationship with St. Mary officers would not influence him in arriving at a verdict appears reasonable.
This assignment is without merit.
Assignment of Error Number 5
The trial court's refusal to vary the normal order of trial at defendant's request by deferring the opening statement of the defense until after the state's case in chief was not an abuse of discretion. Defendant has presented no concrete basis for his conclusion that his defense was prejudiced by this ruling.
There is no merit to this assignment.
Assignment of Error Number 6
It was not error to allow introduction of photographs of the victim's mutilated body. This evidence was relevant to whether the murder was committed in an especially cruel, heinous and atrocious manner, and its probative value for this purpose outweighed its prejudicial effect.
Assignments of Error Numbers 7 and 9
Defendant argues that the district court erred by admitting into evidence three photographs of the automobile used in committing the offense and various items taken from the vehicle. He contends there were no grounds for the warrantless search of the vehicle and that the state failed to prove a chain of custody or that the car had not been tampered with before the photography.
*624 Officers discovered the automobile empty and apparently abandoned inside the levee near Luling. They knew the defendant had been arrested for the rape and murder of the victim whose body was discovered near the car. There was probable cause to believe the vehicle had been used to commit the crimes and therefore constituted evidence of the crime and contained other criminal evidence. The auto was located in a place open to the public, and a rainfall threatened to wash away any exterior fingerprints. Thus, the officers were faced with exigent circumstances requiring that they elect one of two courses "reasonable under the Fourth Amendment," Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); either impound the car until a warrant was obtained or carry out an immediate search without a warrant. Under all of the circumstances, the election of the latter reasonable course by the officers does not require that we invalidate their search. See State v. Lewis and Berry, 378 So.2d 396 (La.1979). The evidence does not reflect any substantial basis for questioning the integrity of evidence due to tampering or loss of custody.
This assignment of error is without merit.
Assignment of Error Number 8
The prosecuting attorney requested his witness, a forensic biologist, to assemble a belt, buckle and loop, which had been taken from the vehicle and asked her whether they were matching articles. The district court overruled a defense objection. The witness fitted the items together but answered that she had not performed any scientific tests to determine if they "matched." The defendant argues that this was reversible error because the state failed to lay a proper foundation and the witness was not qualified to testify as to whether the exhibits matched. However, as a matter of fact, the witness did not testify as to whether they matched. As for the witness's demonstration of whether these commonplace articles of clothing could be fitted together, no foundation qualifying her as an expert was necessary. Louisiana law requires that before a witness may qualify as an expert a foundation establishing his competency must be provided to the satisfaction of the court. La. R.S. 15:466. The fact that a witness called as an expert is not competent to give expert testimony, however, does not affect his competency to testify as to matters not requiring expert knowledge. La.R.S. 15:467. By analogy, since no expert knowledge was required to show how the articles of clothing could be assembled, no special foundation for the witness's demonstration was required.
This assignment is without merit.
Assignment of Error Number 10
It was not error to permit the prosecutor to elicit an officer's opinion that the defendant had made his statement willingly. The opinion rule directs the trial judge to prefer admission of the more concrete description to the less concrete, and the direct form of statement to the inferential. He may more liberally use his discretion to admit opinions and inferences as to collateral matters, but he must exercise it more strictly in order to see that the concrete details are brought out as to more crucial matters. There was no reversible error here because the opinion or inference involved did not relate to a matter crucially at issue. See State v. Wheeler, 416 So.2d 78 (La.1982).
Assignment of Error Number 11
When a law enforcement officer was asked, as a prosecution witness, whether defendant understood the Miranda warnings, he replied: "He indicated he understood. He told me he had been arrested before and that he ..." Defense counsel objected and moved for a mistrial, which was denied. The defense rejected the court's offer to admonish the jury to disregard the remark. There was no reversible error. A police officer is not a court official. Consequently, the remark was not a reference by a court official to another crime committed or alleged to have been committed by the defendant, constituting *625 mandatory grounds for mistrial. La. C.Cr.P. art. 770(2). The district court determined that an admonition would have been sufficient to assure the defendant a fair trial. In such a case this decision is within the trial judge's sound discretion. La.C.Cr.P. art. 771. She did not abuse it in this instance.
Assignment of Error Number 12
Defense counsel called as a witness Victor Bruce Perritt, the codefendant whose trial had been severed from defendant's. The defense proposed to have Perritt testify that he had been convicted of first degree murder for his part in the killing and that he had been sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. The court sustained the state's objection to relevancy and ruled this portion of Perritt's testimony inadmissible. The judge agreed that Perritt's sentence was irrelevant and was made further irrelevant than a statutorily imposed sentence because it was imposed as a result of a hung jury. Defendant contends this ruling was in conflict with Code of Criminal Procedure articles which provide that the jury may consider any relevant mitigating circumstance. We conclude that the trial judge ruled correctly, although the question is not without difficulty.
In order to pass federal constitutional muster capital sentencing procedures must be designed to prevent a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner by directing and limiting the jury's discretion so that the death penalty will be imposed in a consistent and rational manner and so that there will be a meaningful basis for distinguishing the cases in which it is imposed from the many in which it is not. See Gregg v. Georgia, supra; Lockett v. Ohio, supra, 98 S.Ct. at p. 2963.
In Louisiana, our state constitution prohibits the imposition by law of excessive punishment. La. Const. art. 1 § 20. Accordingly, a sentence which amounts to excessive punishment under the constitution is prohibited, even if it has been authorized by statute. State v. Sepulvado, 367 So.2d 762 (La.1979). A constitutionally excessive sentence is one that is grossly out of proportion to the severity of the crime; or makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering. State v. Lathers, 444 So.2d 96 (La.1983); State v. Telsee, 425 So.2d 1251 (La.1983); State v. Sims, 410 So.2d 1082 (La.1982); State v. Johnson, 406 So.2d 569 (La.1981); State v. Kersey, 406 So.2d 555 (La.1981); State v. Snider, 406 So.2d 209 (La.1981); State v. Russell, 397 So.2d 1319 (La.1981); State v. Williams, 397 So.2d 1287 (La. 1981); State v. Beavers, 382 So.2d 943 (La. 1980); State v. Goode, 380 So.2d 1361 (La. 1980). In determining whether a sentence is grossly disproportionate to an offense, consideration must be given to whether the sentence is disproportionate to the penalties imposed in similar cases, considering both the circumstances of the crimes and the characters and propensities of the offenders. State v. Lathers, supra; State v. Tel see, supra; See Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The considerations that account for the use of these standards in determining whether non-capital sentences are excessive surely cannot be less important in capital cases. Given that the imposition of death by public authority is so profoundly different from all other penalties, Lockett v. Ohio, supra, we cannot avoid the conclusion that the same standards of sentence review, including the comparison of similar cases for proportionality, are essential in capital cases under our state constitutional guarantee against excessive punishment.
In an effort to institute a constitutional death penalty system, the legislature enacted a bifurcated trial procedure patterned after others previously approved by the United States Supreme Court. Under the system the jury first decides the guilt or innocence of the accused. After a determination of guilt of first degree murder, the jury decides whether a life sentence or a *626 death penalty is appropriate to the particular case. La.C.Cr.P. art. 905, 905.1. The jury's discretion is directed and limited in that it must find that defendant's case involves a legally prescribed, aggravating circumstance as a prerequisite to the imposition of the death penalty. La.C.Cr.P. art. 905.3, 905.4. Furthermore, before recommending a death penalty, the jury must consider certain statutorily prescribed mitigating circumstances and any other relevant mitigating circumstance which may exist in defendant's case. La.C.Cr.P. art. 905.3, 905.5(h). To complete the death penalty system the legislature mandated that the Louisiana Supreme Court "shall review every sentence of death to determine if it is excessive" and "shall establish such procedures as are necessary to satisfy constitutional criteria for review." La.C.Cr.P. 905.9.
In cooperation with the legislative effort to implement a death penalty system that meets both federal and state constitutional requirements, this court in response to the request or mandate of the legislature established procedures deemed necessary to satisfy constitutional criteria for review. See La.C.Cr.P. art. 905.9; La.Supreme Ct. Rule XXVIII. The primary requirements of these constitutionally necessary procedures are that "every sentence of death shall be reviewed to determine if it is excessive," and that three standards be used to measure for excessiveness, one of which is "whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." La.Sup.Ct. Rule XXVIII, Section 1.
Defendant argues that he was entitled to have the jury consider that his codefendant received a life sentence as a mitigating circumstance or as a meaningful basis for deciding whether his case falls within the capital or non-capital punishment category. There can be little doubt that a comparison of defendant's case to similar first degree murder cases would provide a meaningful basis for determining whether the case is one of the relatively few in which the death penalty is to be imposed or one of the many in which it is not. Such a comparison also could reveal to the sentencer other relevant mitigating circumstances not listed in the statute.
We conclude, however, that the district court did not err in deciding that the evidence was inadmissible. A detailed comparison of the individual aspects of a defendant's case with those of similar cases is certainly relevant to the ultimate goal of our system, viz., to meaningfully distinguish between the cases in which capital punishment is imposed and the many in which it is not. The presentation and consideration of such comparative information to a jury, however, would be excessively time consuming, and probably confusing and distracting. Cf. State v. Ludwig, 423 So.2d 1073 (La.1982). In the absence of an express statutory requirement, therefore, we do not believe that it was the legislative aim to require a detailed comparative analysis of other first degree murder cases and sentences by the jury in a capital sentence hearing. The jury is not precluded from deciding on an intuitive basis whether the death penalty is disproportionate after considering any other mitigating evidence. Furthermore, although this relevant evidence is excluded from the jury proceedings in the interest of avoiding excessive time consumption, confusion or distraction, the duty of performing a detailed comparative proportionality review as a safeguard is imposed on this court by the constitution and court rule. La. Const. art. 1 § 20; La.Sup.Ct. Rule XXVIII. This court does not sit as a sentencer in capital cases. In reviewing each capital sentence to determine if it is excessive, however, this court is required to perform an objective comparative proportionality review to assure that the jury's intuitive proportionality determination was not unreasonable. Id.
Assignment of Error Number 14
By this assignment defendant contends that the district court erred by allowing the prosecution to introduce evidence obtained from a search of the house trailer in which he and his codefendant were arrested.
*627 Prior to trial defendant moved to suppress his confession as well as certain hair, blood and saliva samples, but when queried by the trial judge, he specifically declined to challenge the evidence at issue through these assignments and consequently the evidence was introduced without objection in the guilt phase. Accordingly, unless the defendant can show how reintroduction of the evidence would be unfair or inject an element of arbitrariness or capriciousness into the proceedings, the statute permits its reintroduction. Because the jury was rightfully aware that the defendant's guilt had been established, we are unable to see how defendant was unfairly prejudiced by the reintroduction of this evidence.
This assignment is without merit.
Assignment of Error Number 15
By this assignment defendant complains of references by state witnesses to a rape evidence kit which ultimately was not introduced into evidence. The state's forensic biologist witness and a chain of custody witness referred to the kit in their testimony. When the state offered the kit during the second sentence hearing, the defense objected because the doctor who removed the pubic hairs from the victim had not testified. The state withdrew its offer, and the kit was not introduced. Nevertheless, the defendant argues that his case was unfairly prejudiced by the state's witnesses' references to the kit. This argument is without merit. The rape evidence kit had been introduced into evidence during the guilt trial. Its reintroduction at the penalty phase would not have created a substantial risk that the death penalty would be inflicted in an arbitrary or capricious manner. Appreciable evidence that defendant raped the victim was introduced at both the guilt and penalty trials. The defendant did not attempt to mitigate his offense by showing lack of complicity in rape of the victim. There does not appear to be a substantial possibility that the mere mention of the existence of a rape evidence kit by two state witnesses would have affected the jury's penalty recommendation under the circumstances of this case.
Assignment of Error Number 17
In rebuttal to the defendant's expert testimony as to his mental disease and retardation (tending to mitigate his offense), the state tendered medical evidence. It consisted of the testimony of the two psychiatrists, who had been appointed to a lunacy commission. However, one of the psychiatrists, Dr. Ritter, had also examined the defendant in jail as a treating physician on a single occasion when the defendant complained of headaches, insomnia and anxiety following his grandmother's death. Although Dr. Ritter did not divulge any of defendant's communications on that occasion, he conceded that his opinion of defendant's mental condition, to which he testified, was based on all of his examinations, including the one in which he was a treating physician.
The defendant objected to the testimony of Dr. Ritter on the ground that his opinion was received into evidence contrary to the physician-patient privilege provided by La. R.S. 15:476.[1] This enactment prohibits a physician from disclosing any information or opinion which he may have acquired while employed by any patient. Thus, the primary requisite for the privilege is that the patient must have employed and consulted the physician for treatment or for diagnosis looking toward treatment. See McCormick, Evidence § 103.
*628 The statute expressly provides two exceptions to the privilege: The physician may disclose information or opinion so acquired with his patient's consent; and the statute expressly exempts from its scope information derived from investigations by physicians under court appointment. Neither exception applies to any information or opinion acquired by Dr. Ritter on the single occasion in which he acted as defendant's treating physician, as opposed to the times he acted under court appointment as a lunacy commissioner.
This court has recognized, however, that the physician-patient privilege is not intended to apply to information or opinion genuinely relevant to the narrow issue of defendant's mental health or condition when defendant tenders either as an issue in the trial, provided also that its probative value outweighs its prejudicial effect. State v. Aucoin, 362 So.2d 503 (La.1978); State v. Berry, 324 So.2d 822 (La.1975).
Accordingly, since defendant tendered his mental illness and retardation as an issue in the penalty hearing, information relevant to this narrow question is outside the privilege and should have been admitted unless it was unduly prejudicial. We conclude that Dr. Ritter's testimony was highly probative and not unfairly prejudicial. He excluded from his testimony any information given to him by the defendant when he treated him. Thus, none of the prejudicial factors which this court has directed trial courts to consider and weigh carefully were present. See State v. Aucoin, supra at 506. The probative value of Dr. Ritter's testimony clearly outweighed its prejudicial effect, and it was properly admitted.
Assignment of Error Number 18
By this assignment the defendant argues that the district court permitted the state to introduce improper rebuttal evidence. Defendant's psychiatrist witness explained the difference between legal insanity and one of the mitigating circumstances, viz., "[a]t the time of the offense the capacity of the offender to appreciate the criminality of his conduct as to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication." La.C.Cr.P. art. 905.5(e). He testified that the defendant was mentally retarded, and thereby defective, and was afflicted with a borderline personality, which is a mental disease.
In rebuttal the state, over the defendant's objection, was permitted to introduce psychiatric opinion testimony to the effect that defendant was legally sane at the time of the offense. Defendant argues that this evidence was confusing and improper rebuttal. The argument is without reversible merit. The prosecution has the right to rebut the evidence adduced by the defendant. R.S. 15:282. Rebuttal evidence is that which is offered to explain, repel, counteract or disapprove facts given in evidence by the adverse party. State v. Constantine, 364 So.2d 1011 (La.1978). The prosecution's rebuttal evidence explained and counteracted the defendant's evidence, and it was fairly offered as a possibly needed clarification after the defense adduced evidence as to legal insanity from its expert witness.
Assignment of Error Number 19
The state's psychiatrist witnesses were not erroneously allowed to testify from records which they did not compile. The records complained of were introduced at the guilt phase of the trial and more importantly, the psychologist who prepared them was called as a witness at the sentencing hearing and testified at length as to her testing and test results which comprised the record objected to. The introduction of the evidence did not violate the physician-patient privilege because it related to the mental defect or disease which defendant tendered as an issue.
Assignment of Error Number 20
By this assignment the defendant complains for the first time that the death penalty should be set aside because the *629 prosecution psychiatrists referred to defendant's acts as an example of "sadistic behavior." Defendant argues that this testimony was not relevant to whether the murder was committed in an especially heinous, atrocious or cruel manner, that the term "sadistic behavior" is inflammatory, and that the testimony's prejudicial effect therefore outweighed its probative value. It is self evident that this argument is without merit.
Assignment of Error Number 21
It was not reversible error to permit the prosecution to ask its psychiatrist witness to describe what most laymen understood by "mentally retarded." The doctor was qualified to testify as to the subject, and it was a proper part of the state's rebuttal to the defense mental retardation case in mitigation.
Assignment of Error Number 22
In his closing argument the prosecuting attorney stated that the defendant's confession had been "[s]igned on every page by John Brogdon, by Kenny Schmill, by Frank Larson-Lansen. There has been no testimony that this man didn't sign it. And, they all testified he did." Defendant argues this remark warranted a mistrial because it "refers directly or indirectly to... [t]he failure of the defendant to testify in his own defense." La.C.Cr.P. art. 770(3). The argument is without reversible merit. The remark did not direct the jury's attention to the defendant's failure to take the stand in his behalf.
Assignment of Error Number 23
Defendant objected to the district attorney's argument that "if I had been sitting in jail for a year, year and a half, two years; I don't know if I could read rat...." This plainly was not an improper suggestion that the jury should accept the district attorney's opinion or extra-judicial knowledge of a subject matter in place of evidence deduced at trial. The district attorney's argument was proper as an attempt to persuade the jury of one reasonable view of the evidence, viz., that the defendant's mental capacity had deteriorated while in jail.
Assignment of Error Number 25
By this assignment defendant contends that the district court erred in instructing the jurors that they were "not to be influenced by sympathy, passion, prejudice, or public opinion." This court considered another defendant's objection to an identical instruction in State v. Watson, supra, and concluded that the instruction did not inject a substantial risk that the death penalty would be imposed unfairly, arbitrarily or capriciously for the following reasons: The instruction does not specifically direct the jury to eschew sympathy for the defendant but may have been intended to avoid a decision based on sympathy for the victim. The trial court fully enumerated the statutory mitigating circumstances and clearly instructed the jury that it must consider any other relevant mitigating circumstance in favor of the defendant. Furthermore, the district court instructed the jury that even though it found one or more aggravating circumstances, it could still conclude that the overall circumstances are insufficient to warrant a death penalty and would be free even in the absence of any evidence in mitigation to return a verdict of life imprisonment without benefit of parole, probation or suspension of sentence. Because the group of instructions given in the present case was substantially identical to those with which the jury was charged in State v. Watson, supra, we conclude that the defendant was not unfairly prejudiced by the challenged jury instruction.
This assignment of error lacks merit.
Assignment of Error Number 26
By this assignment defendant argues that one of the aggravating circumstances involved in this case, viz., that "the offense was committed in an especially heinous, atrocious, or cruel manner," is unconstitutionally vague and overbroad. In reviewing death penalties based upon this aggravating circumstance, this court has *630 applied a narrowing construction, viz., in order for the jury to find that the offense was committed in an especially heinous, atrocious or cruel manner, there must exist evidence, from which the jury could find beyond a reasonable doubt, that there was torture or the pitiless infliction of unnecessary pain on the victim. Furthermore, this court has stated that juries considering whether to impose the death penalty on the basis of this aggravating circumstance should be instructed on the proper, narrow construction of the statute. State v. Sonnier, 402 So.2d 650 (La.1981). When the aggravating circumstance is employed in this manner, as it was in the present case, it is not unconstitutional. Id.; State v. Clark, 387 So.2d 1124 (La.1980). See State v. Sonnier, 379 So.2d 1336 (La.1979) (on original hearing); State v. English, 367 So.2d 815 (La.1979).
Assignment of Error Number 27
By this assignment defendant argues that the state's rebuttal argument contained an unfairly prejudicial comment: "[I]f that mitigation doesn't outweigh the aggravating circumstances in this case, the cruelness (sic), the haneous (sic), the rape, then you have got tothe law says you have got to ... if I have proven, the State has proven this, beyond a reasonable doubt, I ask you and I beg you to bring back the death penalty and make that recommendation for John Brogdon." The district attorney almost misstated the law to the jury. However, he broke off that statement before completion and merely requested the jury to bring back the death penalty if it found that he had proven an aggravating circumstance beyond a reasonable doubt.
Immediately thereafter in its instructions to the jury the trial court explained the law correctly and thoroughly. The trial court instructed the jurors that "even if you find the existence of one or more aggravating circumstances, you must also consider any mitigating circumstances before you decide whether the sentence of death should be imposed." The trial court further instructed the jury that even after finding an aggravating circumstance, it may still conclude that the overall circumstances are insufficient to warrant death, and that it would be free, even in the absence of any evidence in mitigation, to return a verdict of life imprisonment. Under these circumstances, the near misstatement of the law by the district attorney in his closing argument did not create a substantial risk that the death penalty would be imposed unfairly, arbitrarily or capriciously.
This assignment is without merit.

INDEPENDENT REVIEW FOR EXCESSIVENESS
This court is required to review every sentence of death to determine if it is excessive and to establish review procedures by its own rules. La. Const., art. 1 § 20; La.C.Cr.P. 905.9. This court's rule provides that in determining whether the sentence is excessive this court shall determine: (a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.Sup.Ct. Rule XXVIII.
In reviewing the defendant's assignments of error we have considered and disposed of a number of arguments related to (a) and (b) above. Now we undertake an independent review under (a), (b) and (c) of La.Sup.Ct. Rule XXVIII, section 1 to determine whether the sentence is excessive.
The Uniform Capital Sentence Report with the attached PSI report indicates that the defendant, a white male, was 19 years old at the time of the crime. He was unmarried with no children or other dependents. His father was an alcoholic child abuser who had been diagnosed as schizophrenic. His mother's death in 1974 greatly impacted defendant's life. Defendant had been brutalized by his father during his formative years. Defendant was *631 one of five children who were eventually removed from the father's house and placed in foster homes. Defendant, who completed sixth grade, was diagnosed a borderline personality with an I.Q. of 60-80.
He had no significant work history although he had worked as a service station attendant and a barge cleaner at various times. Defendant was known to be heavily involved in drug use. John Brogdon had been in trouble from his juvenile years; he had also run away from foster homes countless times.
The victim was an eleven-year-old white girl who had been raped, forced to perform oral sex, battered, bludgeoned, cut with a broken bottle, and struck with a brick. The defendant was not related to the victim; however, he knew her since they had grown up in the same area.
Defendant's prior criminal record consisted of four misdemeanor offenses as a juvenile, one conviction of theft of less than $100 as an adult, and six arrests for non-traffic misdemeanors as an adult.

Review for Arbitrariness
From an independent review to determine whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, we find nothing which raises any question in addition to those argued by defendant and previously considered in this opinion. Accordingly, we have found no error which created a substantial risk that the death sentence was imposed in an arbitrary, capricious or unfair manner.

Review For Sufficiency of Evidence Supporting Jury's Finding of Aggravating Circumstances
The jury found that (1) the defendant was engaged in the perpetration or the attempted perpetration of aggravated rape; (2) the offense was committed in an especially heinous, atrocious or cruel manner.
Defendant's confession clearly indicated that both he and Perritt had raped the victim more than once in addition to making her perform oral sex, that they had hit and punched on her throughout and had then stabbed her with bottles and hit her with a brick while the eleven-year-old begged for her life. Dr. Paul McGarry, the pathologist who performed the autopsy on the victim, testified that there was extensive damage to the surface of the victim's body; that her face was swollen with lacerations of the eyelids and to the bone of her forehead, fractures of her skull, and that the left side of her face was crushed and her nose broken. There were lacerations in the gums inside her mouth and deep stab wounds to her neck exposing the wind pipe and blood vessels. The major vein and the main artery of the neck were severed; she had lost most of her blood. There were three stab wounds to her chest and five to her upper abdomen which exposed her internal organs. There were also indications that she had been alive and trying to breathe while she was being stabbed and cut repeatedly. The victim also had extensive defensive injuries to her arms and elbows. Her vaginal tissues were swollen and rubbed raw with the skin partially missing. There were three stab wounds up through the vagina into her abdominal cavity. Due to the body swelling, Dr. McGarry concluded that it took over an hour from the time of the first injuries for eleven-year-old Barbara Brown to die. The evidence thus reasonably supports a finding of each aggravating circumstance beyond a reasonable doubt.

Comparative Proportionality Review
This court is required by our state constitution and its own rule in each capital sentence review to conduct a comparative proportionality review to determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La. Const. art. 1 § 20; La.Sup.Ct. Rule XXVIII. State v. Lathers, 444 So.2d 96 (La. 1983); State v. Lindsey, 428 So.2d 420 (La. 1983), cert. den. sub nom Lindsey v. Louisiana, ___ U.S. ___, 104 S.Ct. 261 (1983); State v. Telsee, 425 So.2d 1251 (La.1983); *632 State v. Sepulvado, 367 So.2d 762 (La. 1979) (See statistical proportionality review at page 772 and statistics in court's unpublished but public appendix).
The district attorney is required to file a memorandum including a description of each first degree murder case in the district in which sentence was imposed after January 1, 1976. La.Sup.Ct. Rule XXVIII, Sec. 4. If there are not sufficient similar cases within the district, however, nothing prevents this court from referring to similar or comparable cases elsewhere in the performance of its constitutional and judicial duty to conduct a meaningful comparative proportionality review. See State v. Welcome, 82-KA-2232, 458 So.2d 1235 (La.1983) (Lemmon, J.).
Because we find that the list of cases presented by the district attorney does not contain any case similar to the present case, we refer to a group of cases from other districts. A brief description of each case follows:
State v. Baldwin, 388 So.2d 664 (La. 1980) (First degree murderdeath sentence). The defendant, a mature man whose age at the time of the crime was reported as 35 by one source and 40 by another, beat an 85 year old woman with a skillet, a stool and a telephone. He left her lying on her kitchen floor with broken jaw and cheek bones. She suffered brain damage and died the following day of a cerebral hemorrhage. The jury found that (1) the defendant was engaged in armed robbery (2) the offense was especially heinous. There was evidence that defendant consumed alcohol before the crime but no indication that he was unaware of his actions. The defendant's I.Q. was 147. The Post Sentence Report compiled in Baldwin's case showed a prior history of criminal activity commencing at an early age.
State v. Willie, 410 So.2d 1019 (1982); 436 So.2d 553 (La.1983) (First degree murderdeath sentence). The 25 year old defendant and his companion persuaded the 18 year old woman victim to get in their car with an offer of a ride home. They took her to a wooded area, disrobed her, forced her to walk naked down into a gorge where they raped her. After the rapes, one held her hands while the other repeatedly stabbed her in the throat. According to a pathologist, her death came slowly and very painfully. Aggravating circumstances found: (1) perpetration of aggravated rape; (2) especially heinous offense. The defendant's I.Q. was a low normal of 81. His substantial history of criminal activity included simple burglary, motor vehicle violations, criminal damage, aggravated escape, conspiracy to kidnap, kidnapping and second degree murder.
State v. Sawyer, 422 So.2d 95 (La.1982) (First degree murderdeath sentence). The almost 30 year old defendant and his companion stripped the young female victim, dragged her by her hair, and dunked her in a bathtub of scalding water. She was kicked in the chest and knocked unconscious in the bathroom. She was dragged into a living room and beaten and kicked. They poured lighter fluid on her torso and genital area and set her on fire. The victim died several weeks later as a result of the severe blows to her head and third degree burns over one third of her body. Aggravating circumstances found: (1) perpetration of aggravated arson; (2) especially heinous offense. Defendant's prior record consisted of a conviction of involuntary manslaughter.
State v. Taylor, 422 So.2d 109 (La.1982) (First degree murderdeath penalty). The twenty-nine year old defendant lured his adult male victim to a deserted shopping center parking lot on the pretext of inspecting a car the victim had advertised as for sale. He stabbed the victim over 20 times with a sharp knife at least three inches long and stuffed him in a car trunk. Medical evidence indicated that the victim lingered in pain for 10 to 20 minutes before dying. Aggravating circumstances found: (1) perpetration of armed robbery; (2) especially heinous offense. Defendant's prior record consisted of an undesirable military discharge, a conviction of grand larceny, and pending charges of robbery and receiving stolen property.
*633 The present defendant was younger and his criminal record less extensive than most of the offenders in the cases which we have used as the basis for comparison of sentences. Brogdon's consumption of alcohol was excessive, and his dull normal intelligence and borderline personality diminished his intellectual capacity to some extent. Nonetheless, the jury was not unreasonable in concluding that these mitigating circumstances failed to offset the especially heinous, atrocious and cruel features of his murder and aggravated rape of an eleven year old child. Accordingly, we conclude that despite some differences in circumstances, the defendant's crime is comparable to those in the cases described above and that, as in those cases, the death penalty is not a disproportionate sentence.
Defendant argues that State v. East (Iberia Parish Docket No. 1976), a case cited in the State's sentence review memorandum wherein a defendant received a life sentence instead of the death penalty, is comparable to his case and shows that his sentence is excessive. After being charged with first degree murder and being committed to a state mental institution for lack of mental capacity, East pleaded guilty to the second degree murder of a five-year old girl. East lured the child to a wooded area in New Iberia where he raped her and strangled her with a boot lace. East's case is not comparable to Brogdon's because East's sentence resulted from a guilty plea to second degree murder which obviated a jury penalty hearing and determination. Moreover, there are significant differences between the cases. The description of the case provided us does not indicate that the East homicide was as heinous as the present murder. It appears that East was definitely mentally retarded and far more emotionally unstable than Brogdon.
For the reasons assigned, defendant's capital sentence is affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until (a) defendant fails to petition timely the United States Supreme Court for certiorari, (b) that court denies his petition for certiorari or (c) further orders of this court.
CAPITAL SENTENCE AFFIRMED.
MARCUS, J., concurs.
CUTRER, Justice Ad Hoc, sitting for LEMMON, J., recused.
NOTES
[1] La.R.S. 15:476 provides: "No physician is permitted, whether during or after the termination of his employment as such, unless with his patient's express consent, to disclose any communication made to him as such physician by or on behalf of his patient, or the result of any investigation made into the patient's physical or mental condition, or any opinion based upon such investigation, or any information that he may have gotten by reason of his being such physician; provided, that the provision of this article shall not apply to any physician, who, under the appointment of the court, and not by a selection of the patient, has made investigation into the patient's physical or mental condition; provided, further, that any physician may be cross-examined upon the correctness of any certificate issued by him."